UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDWARD J. ROGOZINSKI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 04 C 6947 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| HARTFORD LIFE AND ACCIDENT ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

When Hartford Life and Accident Insurance Company ("Hartford") terminated the long-term disability payments Edward J. Rogozinski ("Rogozinski") was receiving under his employer-sponsored benefit plan, Rogozinski sued Hartford, seeking to recover those benefits pursuant to section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (2006). Hartford counterclaimed, seeking reimbursement of a portion of the payments it made to Rogozinski because he also received benefits from the Social Security Administration ("SSA") and Prudential Insurance Company of America ("Prudential") during the relevant time period. Rogozinski moved for summary judgment on Hartford's counterclaim, and Hartford filed a cross-motion for summary judgment on both Rogozinski's ERISA claim and its counterclaim. For the reasons discussed below, Rogozinski's motion is denied, Hartford's motion is granted, and judgment is entered in Hartford's favor.

**I. BACKGROUND**

Before reciting the relevant facts, the court must briefly discuss the sources from which those facts are drawn. The court does not have a proper factual submission from

1

Rogozinski before it because Rogozinski did not support his summary judgment motion with a statement of material facts, as required by Northern District of Illinois Local Rule 56.1(a)(3). While this failure alone is grounds for denying Rogozinski's motion, the court will excuse the gaffe because it appears to be the result of Rogozinski's attorney's poor health rather than mere oversight. *See, e.g.*, *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) (district court has discretion to strictly apply or overlook transgressions of local rules). However, Rogozinski's response to Hartford's Local Rule 56.1(a)(3) statement likewise does not comply with the local rules. That document does not include record citations to support Rogozinski's position on the facts he disagrees with (although it bears mentioning that the vast majority of Hartford's facts are undisputed). *See* N.D. Ill. Local R. 56.1(b)(3)(B). It also contains no support for the eight additional facts Rogozinski wishes the court to take into account. *See* N.D. Ill. Local R. 56.1(b)(3)(C). The court cannot overlook these transgressions because Rogozinski's attorney was well aware of the requirements of the local rules by the time he filed his response to Hartford's material facts.[1] The court therefore accepts as true all of the facts set forth in Hartford's Local Rule 56.1(a)(3) statement and disregards the eight additional facts pleaded by Rogozinski.[2] *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006); N.D. Ill. Local R. 56.1(b)(3)(C). Accordingly, the

---

[1] Indeed, in its response to Rogozinski's motion for summary judgment, Hartford argued that the motion should be denied because of Rogozinski's failure to comply with Local Rule 56.1(a)(3). In reply, Rogozinski argued that his omission of a 56.1(a)(3) statement was inadvertent and due to his attorney's recent surgery. Notwithstanding that Hartford had identified the requirements of the local rules for him, however, Rogozinski then filed his response to Hartford's Local Rule 56.1(a)(3) statement, which again failed to comply with the local rules.

[2] Even if Rogozinski's disagreements with Hartford's material facts and his additional facts were taken into account, the lack of evidentiary support notwithstanding, the result would not be affected—summary judgment for Hartford would still be required.

following facts are taken from Hartford's Local Rule 56.1(a)(3) statement but recited in a light most favorable to Rogozinski. *Raymond*, 442 F.3d at 608.

Rogozinski was employed by R.R. Donnelly & Sons Company ("Donnelley") as Manager of Executive Compensation. While at Donnelley, Rogozinski participated in an ERISA-governed employee benefit plan sponsored by Donnelley that included a group disability insurance policy ("the Policy") with Hartford. Under the Policy, employees who are disabled are eligible to receive a monthly benefit payment. The amount of the payment is calculated by multiplying the person's monthly income by 60%, comparing the result with the maximum benefit for which the person is enrolled (here, $12,000), and deducting "Other Income Benefits" from the lesser of the two numbers. Def.'s Local R. 56.1(a)(3) Statement ¶ 8. The Policy defines "Other Income Benefits," in relevant part, as follows:

> [T]he amount of any benefit for loss of income, provided to you or to your family, as the result of the period of Disability for which you are claiming benefits under this plan. This includes any such benefits for which you or your family are eligible or that are paid to you, to your family or to a third party on your behalf, pursuant to any:
> . . . .
> 2. governmental law or program that provides disability or unemployment benefits as a result of your job with the Employer;
> 3. plan or arrangement of coverage, whether insured or not, or as a result of employment by or association with the Employer as a result of membership in or association with any group, association, union, or organization . . . .

*Id.* ¶ 12. The Policy notes that overpayments can occur due to retroactive allocation of "Other Income Benefits" or failure to report "Other Income Benefits," and that Hartford is entitled to recover the amount of the overpayment in such instances.

Under the Policy, an employee is considered disabled if he, *inter alia*, is prevented from "performing one or more of the Essential Duties" of his occupation for

3

the upcoming eighteen months due to "accidental bodily injury." *Id.* ¶ 9. After eighteen months have passed, the employee must be "prevented from performing one or more of the Essential Duties of Any Occupation." *Id.* "Any Occupation" means "an occupation for which you are qualified by education, training, and experience, and that has an earnings potential greater than an amount equal to the lesser of 60% of your Indexed Pre-disability earnings and the Maximum Monthly Benefit." *Id.* ¶ 11. "Essential Duties" are those that are "substantial, not incidental," "fundamental or inherent to the occupation," or "can not be reasonably omitted or changed." *Id.* ¶ 10. Working the number of hours in a regularly scheduled workweek is also considered an essential duty. Importantly, the Policy expressly grants Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy." *Id.* ¶ 7. Thus, Hartford is empowered to terminate benefit payments if it finds that an employee is "no longer Disabled as defined." *Id.* ¶ 14.

On March 30, 1999, Rogozinski underwent knee replacement surgery on both of his knees after being diagnosed with bilateral degenerative joint disease. Prior to his surgery, Rogozinski submitted a short-term disability claim to Hartford. Hartford approved the claim, and Rogozinski received short-term disability benefits from April 6, 1999, through October 4, 1999. In October of 1999, Rogozinski requested long-term disability. His surgeon submitted an "Attending Physician's Statement of Continued Disability" ("APS") to Hartford stating that Rogozinski was suffering complications in his left knee that might require an additional surgery and that he was "currently totally disabled." *Id.* ¶ 26. Hartford also interviewed Rogozinski regarding his medical condition. On October 20, 1999, Hartford approved Rogozinski's long-term disability

claim retroactive to October 5, 1999, "finding that Rogozinski was limited in his ability to stand and sit for prolonged periods due to arthrofibrosis of the left knee following his knee replacement." *Id.* ¶ 29. In the approval letter it sent to Rogozinski, Hartford advised him that, under the Policy, he would receive 60% of his pre-disability income, subject to the "Other Income Benefits" provisions. Hartford also advised Rogozinski that, after eighteen months of disability (as of April 4, 2001), he would have to meet the "Any Occupation" provision of the Policy to continue receiving disability benefits. Finally, Hartford asked Rogozinski to apply for Social Security Disability ("SSD") benefits, which he soon did. Thereafter, Rogozinski began receiving monthly benefit payments of $4,950 from Hartford.

On October 22, 1999, Rogozinski signed a "Payment Options and Reimbursement Agreement" ("Reimbursement Agreement"), in which he elected not to have his benefit payments reduced by the amount he would likely receive each month if his SSD claim was approved. He acknowledged, however, that his benefit payments would be reduced by any "Other Income Benefits" he received, as defined in the Policy, and that his decision with regard to his SSD claim could result in an overpayment of benefits for which he would have to refund Hartford. He also agreed that, in the event of an overpayment, Hartford could reduce or eliminate his future disability payments in order to recover the discrepancy.

During the following months, Rogozinski continued to submit documentation to support his long-term disability claim. Specifically, his doctors sent Hartford several APS reports stating that Rogozinski remained disabled due to worsening conditions in his left knee. Rogozinski had a second surgery on his left knee on August 18, 2000, and

shortly thereafter he contacted Hartford to inform it that his surgery had gone well. In October of 2000, Hartford initiated a review of Rogozinski's claim to determine whether he would remain eligible for disability benefits after April 4, 2001 (i.e., whether he could meet the "Any Occupation" provisions of the Policy); Rogozinski continued to claim that he was totally disabled. Hartford informed Rogozinski of its review in a letter dated October 5, 2000, which explained that Rogozinski's benefits would continue until Hartford's review was complete, but that any benefits paid after April 4, 2001, should not be interpreted as an admission of his claim's validity. Hartford also requested additional information regarding Rogozinski's SSD claim, again advising him that approval of his claim would result in a reduction of his payments pursuant to the "Other Income Benefits" provisions.

On December 19, 2000, Hartford received an APS from Rogozinski's surgeon advising it that Rogozinski continued to experience pain and stiffness that was being treated with physical therapy. The APS stated that Rogozinski could stand and walk for short periods but could not sit for an extended time or lift more than twenty pounds. The APS corroborated information Rogozinski relayed in a questionnaire dated December 15, 2000, wherein he noted that, due to severe pain and stiffness, he could not stand or sit for long periods and that he was attending physical therapy three times per week and also exercising on his own each day. After it received the APS, Hartford faxed requests for complete medical records to each of the doctors who had treated Rogozinski.

Rogozinski's SSD claim was also approved in December of 2000, with benefits retroactive to September of 1999. Specifically, Rogozinski received a lump sum award of $24,639 for benefits owed him between September of 1999 and November of 2000,

and monthly payments thereafter. He later received corresponding monthly benefits for his daughter as well as a retroactive lump sum payment of $12,319. Rogozinski informed Hartford of these developments. On January 22, 2001, Hartford sent Rogozinski a letter stating that, due to his receipt of SSD benefits, Rogozinski's disability claim with Hartford had been overpaid and that his monthly benefit payment was being reduced to $2,525. Hartford thereafter began withholding Rogozinski's monthly benefit and applying it to the overpayment. It is undisputed that, as a result of the SSD benefits, Hartford had overpaid Rogozinski by $33,517.60 as of February 7, 2001, including the monthly payment of $2,525 that Hartford withheld for January of 2001.

By April of 2001, Hartford had received all of the medical records it requested from Rogozinski's doctors. The records from Rogozinski's surgeon revealed that on October 3, 2000, six weeks after his second knee surgery, Rogozinski was "doing extremely well and quite pleased with his result." *Id.* ¶ 71. Similarly, on November 21, 2000, Rogozinski had "no complaints and [was] now well functioning and active." *Id.* ¶ 72. Hartford also learned that Rogozinski's last visit with his surgeon had been on January 16, 2001. On that date, "Rogozinski continued to complain about some degree of pain about the knee, some degree of weakness and tendency for the knee to stiffen up unless actively pursuing physical therapy." *Id.* ¶ 73 (internal quotation marks omitted). The surgeon noted that Rogozinski walked with a slight limp but that, "from a clinical standpoint, Rogozinski appears to be stable and his x-rays showed no change." *Id.* ¶ 74 (internal quotation marks omitted).

Based on the medical records it had received, Hartford was concerned that Rogozinski was no longer disabled under the "Any Occupation" provisions of the Policy.

It therefore hired a consulting firm to conduct surveillance of Rogozinski engaging in regular daily activities. During the surveillance, "Rogozinski was observed walking about his property, running errands, lifting a suitcase into the trunk of a car, and repeatedly bending at the knees to clean debris and leaves off of his property." *Id.* ¶ 75. Never did he use any type of ambulatory aid, such as a cane. After receiving this information, Hartford sent a letter to Rogozinski's surgeon requesting a narrative report of Rogozinski's present condition as well as a Physical Capacities Evaluation ("PCE"). Rogozinski's surgeon responded by letter dated June 26, 2001. In that letter, the surgeon described Rogozinski's course of treatment following the second knee surgery, noting that Rogozinski continued to experience pain, stiffness, and malalignment in his left knee for which he was attending physical therapy but that Rogozinski "probably has come close to reaching maximum medical improvement at this point." *Id.* ¶ 79 (internal quotation marks omitted). The letter noted that Rogozinski's right knee, however, had "recovered fairly well." *Id.* ¶ 78. With respect to Rogozinski's ability to work, the surgeon stated that Rogozinski was "capable of sedentary work activities" because he had full use of his upper extremities, could "sit, with sit to stand capabilities over an eight-hour period," and could occasionally lift up to twenty pounds (but never more than twenty-five). *Id.* ¶ 80.

On June 27, 2001, Rogozinski was interviewed at his residence by a Hartford employee. During the interview, Rogozinski stated that he could sit and stand for between fifteen and thirty minutes without experiencing pain and that he had no problems with his hands, vision, hearing, or speech. He also noted that he had maintained his

Certified Public Accountant's ("CPA") license and had done tax work for his friends each of the preceding three years.

Based on the information it had received from Rogozinski and his surgeon, Hartford hired Concentra, an independent consulting company, to perform a labor market study to determine whether Rogozinski was capable of "Any Occupation" given his medical restrictions as well as his vocational background and graduate level education. On August 2, 2001, Concentra issued a report to Hartford that "identified numerous positions for which Rogozinski was qualified, including Auditor, Payroll Supervisor, Bursar, Accountant, Financial Analyst, Employment Manager, Budget Analyst, Loan Review Analyst, and Accounting Supervisor." *Id.* ¶ 88. The report also identified "17 different jobs available at that time for which Rogozinski was qualified, all located within a 30 mile radius of his residence." *Id.*

Relying on the information it had gathered, Hartford terminated Rogozinski's benefits on October 1, 2001, because Rogozinski was no longer "prevented from performing one or more of the Essential Duties of Any Occupation, as defined by and described in the Policy," and was thus no longer disabled. *Id.* ¶ 91. At the time his benefits were terminated, Rogozinski had repaid $20,200 of the amount Hartford had overpaid him due to his SSD benefits; it is thus undisputed that Rogozinski was still obligated to reimburse Hartford an additional $13,317.60.

On January 31, 2002, Rogozinski informed Hartford that he wished to appeal its decision and faxed Hartford purported "updated medical evaluations" from his surgeon and physician. *Id.* ¶ 98. The evaluation from Rogozinski's surgeon, dated November 15, 2001, now stated that Rogozinski "continues to suffer from bilateral knee pain and

stiffness and he cannot sit, stand or walk for any period of time without experiencing severe stiffness in the knees." *Id.* ¶ 99. As a result, Rogozinski's surgeon opined, Rogozinski was "disabled from any type of active work." *Id.* Similarly, the letter from Rogozinski's physician, dated January 28, 2002, discussed Rogozinski's knee replacements and also noted that Rogozinski was suffering from constant low back pain due to "severe degenerative disc disease." *Id.* ¶ 101. Rogozinski's physician stated that "it is difficult for this patient to sit or stand for any extended period of time, and is totally disabled." *Id.* (internal quotation marks omitted).

After receiving the evaluations, Hartford wrote to Rogozinski's surgeon and physician to request updated narrative reports regarding Rogozinski's medical condition, PCEs, and any additional relevant medical records. Upon receiving these documents, Hartford learned that, since the last time it had obtained Rogozinski's medical records in April of 2001, Rogozinski had gone to only two follow-up appointments with his surgeon: on May 17, 2001, and on November 6, 2001. At the visit on May 17, 2001, Rogozinski "complained of stiffness in both knees and an inability to be as active as he would like, as well as difficulty arising from a chair, with occasional pain." The surgeon noted that Rogozinski was clearly "better than he was prior to his revision," *id.* ¶ 109, and that x-rays of Rogozinski's left knee "showed well-fixed and well-aligned components without evidence of complication," *id.* ¶ 108. On November 6, 2001, however, Rogozinski complained of "stiffness if he sits for any period of time" and stated that he "did not feel he could return to work in any capacity." *Id.* ¶ 111. Nonetheless, the surgeon noted that Rogozinski's knees were stable and his "clinical condition essentially remains unchanged." *Id.* ¶ 110 (internal quotation marks omitted).

Hartford conducted a review of Rogozinski's entire file, including the updated information it had received following his appeal. On June 10, 2002, however, Hartford informed Rogozinski that it was upholding its decision to terminate his benefits, once again noting that Rogozinski's medical records did not support restrictions that would preclude his employment in any number of sedentary jobs.

At some point after its decision to terminate Rogozinski's benefits (the record is not clear when), Hartford discovered that Rogozinski had been receiving disability benefits from Prudential during the same time period he had been receiving them from Hartford. Specifically, Rogozinski participated in a welfare benefit plan sponsored by the American Institute of Certified Public Accountants (of which he was a member) that included a long-term disability insurance policy with Prudential. Rogozinski received monthly long-term disability payments of $2,000 from Prudential between June 29, 1999, and January 1, 2002. When Prudential terminated his benefits, Rogozinski appealed, and the parties eventually settled "all claims for past and future long-term disability benefits" for $110,000 on January 4, 2006.

## II. ANALYSIS

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists if the admissible evidence as a whole would reasonably support a jury verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing he is entitled to summary judgment, but a non-

moving party that bears the burden of proof on an issue cannot simply rest on the pleadings; rather, he must point to evidence that would support a jury verdict in his favor. *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, but should not weigh the evidence or evaluate the credibility of witnesses. *Anderson*, 477 U.S. at 255; *see also Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (same).

As detailed below, Hartford has clearly met the standard of Rule 56 of the Federal Rules of Civil Procedure with respect to both Rogozinski's ERISA claim and its own counterclaim. The court will address the parties' competing claims in turn.

### A. Rogozinski's ERISA Claim

Hartford first argues that it is entitled to summary judgment on Rogozinski's ERISA claim, which seeks to recover Rogozinski's long-term disability benefits under the Policy pursuant to 29 U.S.C. § 1132(a)(1)(B) (2006). Claims under section 1132(a)(1)(B) are typically reviewed de novo. *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635, 636-37 (7th Cir. 2005). However, if the administrator of the employee benefits plan at issue has "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," a decision to deny benefits can only be overturned if it was arbitrary and capricious. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 685 (7th Cir. 2004) ("If the plan confers discretionary authority, then a denial of benefits will be reviewed under an arbitrary and capricious standard."); *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000) (same). The arbitrary and capricious standard

of review is "the least demanding form of judicial review of administrative action." *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996). Indeed, the court should not second-guess the administrator's decision; if the "decision has rational support in the record," the court must uphold it. *Davis v. Unum Life Ins. of America*, 444 F.3d 569, 576 (7th Cir. 2006); *see also Johnson v. Allsteel, Inc.*, 259 F.3d 885, 890 (7th Cir. 2001) (the court must accept the administrator's reasonable interpretation of the record even if the claimant advances an equally reasonable interpretation). "Put simply, an administrator's decision will not be overturned unless it is downright unreasonable." *Davis*, 444 F.3d at 576 (citation and internal quotation marks omitted). In considering whether an administrator's decision was reasonable, the court must only consider the materials "that were before the [administrator] when it reached its decision." *Trombetta*, 102 F.3d at 1437 n.1.

In this case, the Policy reserves to Hartford "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy." Def.'s Local R. 56.1(a)(3) Statement ¶ 7. This language is more than sufficient to trigger the arbitrary and capricious standard of review under binding precedent from the Supreme Court and the Seventh Circuit. *See Bruch*, 489 U.S. at 115; *see also Militello*, 360 F.3d at 685 (noting that language similar to the following phrase requires discretionary review: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." (quoting *Herzberger*, 205 F.3d at 331)).

Applying this standard to the facts recited above, the court cannot say that Hartford's decision to terminate Rogozinski's long-term disability benefits was

13

"downright unreasonable." *Davis*, 444 F.3d at 576 (citation and internal quotation marks omitted). Hartford considered a large amount of information, including Rogozinski's medical records, letters from his doctors, surveillance, and an independent labor market study. Based on the information before it, Hartford found that Rogozinski was no longer disabled under the Policy because he was capable of performing the essential duties of a number of other jobs. This conclusion was rationally related to the record, as it took into account Rogozinski's medical restrictions (as relayed by his doctors), his qualifications and training (including his CPA license), and the report by Concentra that considered these criteria. Accordingly, the court is compelled to uphold Hartford's decision, and therefore Hartford's motion for summary judgment on Rogozinski's ERISA claim must be granted.

### B. Hartford's Counterclaim

As noted previously, the parties have filed cross-motions for summary judgment on Hartford's counterclaim, which seeks reimbursement for the amounts Hartford paid Rogozinski between October 5, 1999, and October 1, 2001, that were duplicative of the disability payments Rogozinski received from the SSA and Prudential. Rogozinski concedes that he is obligated to repay Hartford $13,317.60 for the SSD benefits he received. Thus, the only payments at issue are the $48,000 in disability benefits Rogozinski received from Prudential while he was also receiving benefits from Hartford.

Rogozinski's motion contends that all three of the claims asserted by Hartford should be construed as a single claim for unjust enrichment. *See* Pl.'s Mem Supp. Mot. Summ. J. 4-5. According to Rogozinski, Hartford has failed to support its claim with specific factual allegations and "has not alleged that by Rogozinski's paying premiums to

secure additional disability benefits that he has violated principles of justice, equity and good conscience." *Id.* at 4. However, as Hartford points out, its counterclaim clearly asserts three independent claims: (1) a claim for reimbursement pursuant to 29 U.S.C. § 1132(a)(3); (2) a claim for breach of contract; and (3) a claim for unjust enrichment. Thus, even if Rogozinski were entitled to summary judgment on Hartford's unjust enrichment claim, the court could not rule in his favor on Hartford's entire counterclaim, as Rogozinski argues. In any event, Rogozinski has completely failed to meet his burden under Rule 56 with respect to the unjust enrichment claim. Rogozinski conclusorily alleges that Hartford does not have sufficient facts to support this claim, but he does not even identify what Hartford's facts are. He likewise fails to affirmatively marshal any facts that would require the court to rule in his favor. It is not the court's job to sift through the record in order to determine whether a party's conclusory argument has factual support. *See, e.g.*, *Corley v. Rosewood Care Center, Inc. of Peoria,* 388 F.3d 990, 1001 (7th Cir. 2004) (when the plaintiff fails to support an argument with citations to the record, the court "will not root through the . . . documents . . . to make his case for him"); *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in [the record]."). Accordingly, Rogozinski's motion for summary judgment must be denied.

As for Hartford, it has moved for summary judgment only on its claim for reimbursement under section 1132(a)(3), the equitable provision of ERISA. Hartford argues that because the language of the Policy specifically states that Hartford may recover an overpayment caused by a beneficiary's receipt of "Other Income Benefits" (such as disability benefit payments from a third-party insurer), it may impose an

15

equitable lien by agreement on the payments Rogozinski received from Prudential that overlapped with the payments he received from Hartford. Under the Policy, "Other Income Benefits" include:

> [T]he amount of any benefit for loss of income, provided to you or to your family, as the result of the period of Disability for which you are claiming benefits under this plan. This includes any such benefits for which you or your family are eligible or that are paid to you, to your family or to a third party on your behalf, pursuant to any:
> . . . .
> 3. plan or arrangement of coverage, whether insured or not, or as a result of employment by or association with the Employer as a result of membership in or association with any group, association, union, or organization . . . .

Def.'s Local R. 56.1(a)(3) Statement ¶ 12.

Rogozinski attempts to escape the application of this provision to his payments from Prudential by pointing to the Reimbursement Agreement, which Rogozinski claims allowed Hartford to reduce the amount of Rogozinski's monthly benefits only by the amount of any SSD benefits he might receive. This argument is flatly contradicted by the record. The Reimbursement Agreement did set forth a specific arrangement with regard to Rogozinski's potential SSD benefits, the only "Other Income Benefit" of which Hartford was aware at the time. However, the Reimbursement Agreement also specifically informed Rogozinski that, under the Policy, "Long-Term Disability (LTD) benefits will be reduced by the amount of any Other Income Benefits which you are eligible to receive. Please refer to [the Policy] for a full description of Other Income Benefits." Def.'s Local R. 56.1 Supporting Materials, Vol. II 208. That "description" includes the language from the Policy quoted above, which plainly encompasses the disability insurance policy Rogozinski purchased with Prudential through his membership with the American Institute of Certified Public Accountants.

16

More to the point, Hartford has binding Supreme Court precedent on its side. In *Sereboff v Mid Atlantic Med. Servs., Inc.*, 126 S. Ct. 1869, 1873-75 (2006), the Supreme Court unanimously held, under similar circumstances, that an ERISA plan could impose an equitable lien by agreement pursuant to section 1132(a)(3) on funds the plan participants received from a third party. In *Sereboff*, the policy at issue contained an "Acts of Third Parties" provision that gave the plan the right to recover payments made to plan participants by third parties for costs associated with an injury resulting from the acts of another person. *Id.* at 1872. The participants were involved in a car crash, and subsequently received payments for medical treatment from the plan. *Id.* They then filed a state court action against the party responsible for the crash, and ultimately recovered a substantial amount in settlement. *Id.* at 1872-73. However, the participants refused to reimburse the plan for the benefits it had paid, so the plan filed suit in federal court under section 1132(a)(3).

The *Sereboff* Court held that the "Acts of Third Parties" provision in the policy triggered the "familiar rul[e] of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." *Id.* at 1875. Accordingly, an equitable lien by agreement was created the moment the plan participants received money from the third party that they were obligated to repay to the plan pursuant to the language in the policy preventing double-dipping. *Id.* The participants were therefore required to reimburse the plan pursuant to section 1132(a)(3). *Id.*

While the court sympathizes with Rogozinski's situation, *Sereboff* compels him to repay the $48,000 in benefit payments he received from Hartford that are duplicative of

17

the amounts he received from Prudential because the Policy created an equitable lien by agreement the moment he received those funds from Prudential. *Id.* Under factually indistinguishable circumstances, another court in this district applying *Sereboff* reached the same result. *See Gutta v. Standard Select Trust Ins.*, No. 04 C 5988, 2006 WL 2644955, at *26 (N.D. Ill. Sept. 14, 2006) (holding that plan language creating "an offset for 'Income Received From Other Sources,'" which included benefits received from another group plan, created an equitable lien by agreement on payments plaintiff received from defendant that were duplicative of payments he had received under another plan). Accordingly, Rogozinski must reimburse Hartford $13,317.60 for payments that were duplicative of his SSD benefits and $48,000 for payments that were duplicative of benefits paid by Prudential. The court will save Rogozinski one burden, however. Under 29 U.S.C. § 1132(g)(1), attorney's fees and costs are discretionary, and the court will not award them here. Rogozinski will likely be severely affected by the outcome of this case as is, and the court does not believe that his filing of this suit was so unwarranted that he should be required to reimburse Hartford for the costs of defending it.

### III. CONCLUSION

For the foregoing reasons, Rogozinski's motion for summary judgment is denied, Hartford's motion for summary judgment is granted, and judgment is entered in Hartford's favor on both Rogozinski's ERISA claim and Hartford's counterclaim. Rogozinski is ordered to reimburse Hartford $61,317.60 pursuant to 29 U.S.C. § 1132(a)(3) (2006).

SIGNED:

        /s/
Joan B. Gottschall
United States District Judge

DATED: August 21, 2007